**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 2 6 2003 ★

LONG ISLAND OFFICE

| | |
|---|---|
| **JUDITH A. TUCKER**, derivatively, on behalf of Reckson Associates Realty Corp., <br><br> Plaintiff, <br><br> v. <br><br> **DONALD J. RECHLER, GREGG RECHLER, ROGER M. RECHLER, SCOTT RECHLER, MITCHELL RECHLER, HERVE A. KEVENIDES, JOHN V. N. KLEIN, RONALD H. MENAKER, LEWIS S. RANIERI, CONRAD D. STEPHENSON, PETER QUICK, WALTER GROSS and RECKSON OPERATING PARTNERSHIP, L.P.,** <br><br> Defendants, <br><br> - and - <br><br> **RECKSON ASSOCIATES REALTY CORP.,** <br> Nominal Defendant. | Case No. <br><br> **SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> <br><br> CV 03 4917 <br><br> (S.I.) <br><br> PLATT, J. <br><br> ORENSTEIN, M. |

Plaintiff Judith A. Tucker by her attorneys submits this Derivative Complaint and alleges as follows on information and belief based on, among other things, an investigation by and through her attorneys, except for allegations which are based on her personal knowledge:

**NATURE OF THE ACTION**

1.    This derivative action arises out of the self-dealing, self-interested and self-styled "Strategic Plan" (hereafter, the "Strategic Plan") to be implemented by directors and officers of Reckson Associates Realty Corp., ("Reckson" or the "Company").

2.      This derivative action, brought by a shareholder of Reckson, on behalf of the Company, against certain of its officers and directors, seeks to remedy defendants' violations of law, including breaches of fiduciary duties, breach of contract, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, which have caused substantial losses to Reckson and other damages.

3.      Reckson's board of directors (the "Board") and officers, led by defendants Donald J. Rechler ("Donald"), Mitchell Rechler ("Mitchell"), Gregg Rechler ("Gregg"), Roger M. Rechler ("Roger"), and Scott Rechler ("Scott"), members of the Rechler family (the founders of the Company), who have all collected millions in monetary compensation from Reckson, seek to implement by January 1, 2004, a Strategic Plan that amounts to nothing more than a self-interested deal, a no-hassle, lucrative, exit-strategy, that will grossly benefit the Rechler family at the expense of, and with substantial harm to, the Company.

4.      This Strategic Plan was purportedly reviewed by the "outside" or "uninterested directors" of Reckson.  In fact, these individuals are so entangled with the Rechler family that their review is rendered meaningless.

5.      Reckson and its shareholders, who are not entitled to vote on this Strategic Plan, are left at the mercy of Reckson's self-dealing fiduciaries.

6.      The Strategic Plan is the culmination of a systematic scheme to siphon cash and valuable assets to certain officers and directors of Reckson.

7.      In part, the Strategic Plan provides for the Company's divestiture of its Long Island Industrial portfolio to the Rechler family members.

8.      The Industrial Portfolio consists of 95 properties (the "Industrial Properties"), with an average property age of 26 years, an average property size of 62,000 square feet (for a



total of 5.9 million square feet), and approximately 200 tenants (the "Long Island Industrial Portfolio").

9.      The Company is divesting its interests in the Long Island Industrial Portfolio for $315.5 million ($54 per square foot), which is comprised of $219,043,000 in cash, $6,018,000 in the purchasers' assignment of secured debt, and the redemption of 100% of the units owned by the Rechler family in Reckson Operating Partnership, L.P. ("OP") valued at $90,439,000 (3,932,111 OP units at $23.00 per unit).

10.     The Company will have to pay $10.3 million to the Rechler family to settle the employment contracts of certain members of the Rechler family (the "Family Employment Contracts").

11.     Purported pressure by the investment community has given the defendants another "justification" for the Strategic Plan: the adoption of certain "corporate governance" changes so that Reckson can "be an industry leader."

12.     The linking of the Strategic Plan to corporate governance changes is a ruse perpetrated by defendants because the corporate governance changes are vacuous.

13.     Implementation of the Strategic Plan will not eliminate any conflicts of interest and not alleviate the control and influence the Rechler family has over Reckson and the Board.

14.     After the Strategic Plan is completed: (a) the Rechler family will have Reckson common stock ownership in at least the $30 million range; (b) the Rechler family will have been relieved of substantial tax liabilities through Reckson's sale of the Industrial Properties to the Rechler family, rather than on the open market; (c) the Rechler family will have purchased the Industrial Properties at a price not reflecting any competitive bidding from the open market; (d) Scott, the current Co-Chief Executive Officer, Chairman of the Executive Committee and

director of Reckson, will become President and Chief Executive Officer of Reckson; (e) Donald, the current Co-Chief Executive Officer of the Company since May 1999 and Chairman of the Board, will become a non-executive Chairman of the Board; (f) Gregg and Mitchell, cousins and the sons, respectively, of Roger and Donald, will run the new entity that will own the Industrial Properties, Rechler Equity Partners ("REP"), and will remain advisers to Reckson for two years; and (g) Scott will also hold an interest in the REP.

## JURISDICTION AND VENUE

15.     This Court has diversity jurisdiction over the subject matter of this action because there is complete diversity between the named plaintiff and defendants, and because the amount in controversy exceeds $75,000 pursuant to 28 U.S.C. § 1332.

16.     This Court has pendent jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) insofar as one or more of the defendants is located in this district. One or more of the defendants either resides in or maintains executive offices in this district, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this district, and defendants have received substantial compensation in this district by doing business here and engaging in numerous activities which had an effect in this district.

## PARTIES

18.     Plaintiff Judith A. Tucker owns equity securities in Reckson.

19.     Defendant Donald has served as Co-Chief Executive Officer of the Company since May 1999 and has served as Chairman of the Board and a director of the Company since its

4

formation in 1967. In addition, from the Company's formation through May 1999, Donald served as Chief Executive Officer of the Company. Donald also served as President of the Company from its formation until February 1997. Donald will become non-executive Chairman of the Board following the implementation of the Strategic Plan.

      a.     Prior to the Company's initial public offering in June 1995 (the "IPO"), Donald was a co-founder and general partner of Reckson's predecessor entity, Reckson Associates ("RA").

      b.     Donald is the father of Mitchell and the brother of Roger.

      c.     Donald is a member of Reckson's Executive Committee and Disclosure Committee. Reckson's Executive Committee has the authority to approve acquisitions, financings and dispositions by Reckson and to authorize the execution of certain contracts and agreements, including those relating to the borrowing of money by the Company and to exercise generally all other powers of the Board, except for those which require action by all directors or the non-employee directors under the Articles of Incorporation or the Bylaws of Reckson or under applicable law. Reckson's Disclosure Committee is responsible for the development and assessment of the financial and non-financial information to be included in the reports filed by Reckson with the Securities and Exchange Commission (the "SEC").

      d.     Donald is founder and former president and chairman of the Association for a Better Long Island, a founder of the Long Island Commercial & Industrial Development Association, a member of the board of directors of the Development Division of North Shore Hospital, a member of the board of directors of the Long Island Philharmonic, a member of the Council of Overseers of Long Island

University, C.W. Post College and a member of the board of directors of the Nassau County Museum of Art.

        e.     Because of Donald's position, he controlled and was involved with the intricacies and business of Reckson, its accounting transactions, finances, markets and present and future business prospects, had access to internal corporate documents, conversations and connections with other corporate officers and employees, attended management and Board meetings and committees thereof and had access to all reports and other information provided to him in connection therewith.  Donald participated in the development and implementation of the Strategic Plan.

20.    Defendant Gregg has served as Co-President, Chief Operating Officer and a director of the Company since May 2001 and as Secretary of the Company since its formation. Gregg served as Co-Chief Operating Officer of the Company from May 1999 to May 2001 and served as Executive Vice President of the Company from its formation to May 2001.

        a.     Gregg is a member of Reckson's Disclosure Committee.

        b.     Gregg also serves as President of Reckson Construction Group, Inc. ("RCG").

        c.     From 1985 to 1988, Gregg held non-supervisory roles at Reckson in the construction and property management areas. Beginning in 1989, as an Executive Vice President of Reckson, Gregg served as the person responsible for the construction and development activities of the Company.

        d.     Gregg is the son of Roger and the brother of Scott.

        e.     Defendant Gregg, Roger and Scott, along with other Rechler family members, are all owners and breeders of Champion Afghan Hounds and the

Afghans of Grandeur kennel.  Through these activities, the Rechler family is involved with the American Kennel Club, which is chaired by defendant Ronald H. Menaker ("Menaker").

      f.    Because of Gregg's position, he controlled and was involved with the intricacies and business of Reckson, its accounting transactions, finances, markets and present and future business prospects, had access to internal corporate documents, conversations and connections with other corporate officers and employees, attended management and Board meetings and committees thereof and had access to all reports and other information provided to him in connection therewith.  Gregg participated in the development and implementation of the Strategic Plan.

21.    Roger has served as Vice Chairman of the Board and a director of the Company since its formation and as Executive Vice President of Development since February 1997.

      a.    Prior to the  IPO, Roger was a co-founder and general partner of RA.  Roger is responsible for the  supervision of property development and construction, architectural and design-services, interior construction and property management.

      b.    Defendant Roger is the father of Scott and Gregg and the brother of Donald.

      c.    Defendant Roger is a member of Reckson's Disclosure Committee

      d.    Because of Roger's position, he controlled and was involved with the intricacies and business of Reckson, its accounting transactions, finances, markets and present and future business prospects, had access to internal corporate documents, conversations and connections with other corporate officers and employees, attended management and Board meetings and committees thereof and had access to all reports

and other information provided to him in connection therewith. Roger participated in the development and implementation of the Strategic Plan.

22.     Defendant Mitchell has served as Co-President and Chief Administrative Officer of the Company since May 2001 and has served as a director of the Company since its formation. Mitchell served as Co-Chief Operating Officer of the Company from May 1999 to May 2001 and as Executive Vice President of the Company from its formation to May 2001.

        a.     Defendant Mitchell is a member of Reckson's Disclosure Committee

        b.     Mitchell also serves as the President of Reckson Management Group, Inc. (the "RMG").

        c.     From 1981 to 1985, Mitchell was employed by Reckson in various non-supervisory roles including positions in property management, construction, acquisitions and leasing. Since 1986, Mitchell has been responsible for all leasing activities including the coordination of leasing and marketing strategies and overseeing tenant relations.

        d.     Mitchell has served as President of the RMG since its organization in 1991.

        e.     Mitchell is the son of Donald.

        f.     Because of Mitchell's position, he controlled and was involved with the intricacies and business of Reckson, its accounting transactions, finances, markets and present and future business prospects, had access to internal corporate documents, conversations and connections with other corporate officers and employees, attended management and Board meetings and committees thereof and had access to all

reports and other information provided to him in connection therewith. Mitchell participated in the development and implementation of the Strategic Plan.

23.     Defendant Scott has served as Co-Chief Executive Officer of the Company since May 1999, serves as the Chairman of the Executive Committee of the Board and has served as a director of the Company since its formation. He served as President of the Company from February 1997 to May 2001 and served as Chief Operating Officer of the Company from its formation until May 1999. In addition, from the Company's formation until February 1997, Scott served as Executive Vice President of the Company. Scott has been employed at Reckson since 1989.

       a.     Scott serves as chairman of Reckson's Executive Committee and is a member of Reckson's Disclosure Committee.

       b.     Since 1997, Scott has served as chief executive officer and chairman of the board of directors of FrontLine Capital Group ("FrontLine"), a company that filed for protection from creditors under the federal bankruptcy laws in June 2002.

       c.     He also is the non-executive chairman of the board of directors and a former interim executive officer of HQ Global Holdings, Inc., a company that filed for protection from creditors under the federal bankruptcy laws in March 2002.

       d.     Scott is the son of Roger and the brother of Gregg.

       e.     Scott is also a director of Long Island Children's Museum. Scott, Reckson and the Rechler family are also capital campaign donors, classified as Founders Circle Donors ($1,000,000 and above), in addition to being Annual Fund Donors.

f.      Scott was a financial contributor to former Congressman Rick Lazio (R-Brightwaters).

g.      Because of Scott's position, he controlled and was involved with the intricacies and business of Reckson, its accounting transactions, finances, markets and present and future business prospects, had access to internal corporate documents, conversations and connections with other corporate officers and employees, attended management and Board meetings and committees thereof and had access to all reports and other information provided to him in connection therewith.  Scott participated in the development and implementation of the Strategic Plan.

24.     Defendant Menaker has served as a director of the Company since 2002.

a.      From 1966 to 1999, Menaker worked for J.P. Morgan & Co. Inc., holding various positions, including president and a director of J.P. Morgan Services.  At the time of his retirement on January 1, 1999, Menaker was a managing director and head of Corporate Services of J.P. Morgan & Co. Inc. of New York.  Menaker serves as a director of Atlanta Sosnoff Capital Corp., NYU Medical Center, and vice chairman and director of NYU Downtown Hospital.   He was formerly chairman of NYU Downtown Hospital.

b.      Menaker serves on Reckson's Audit Committee and Nominating and Corporate Governance Committee.  The Nominating and Corporate Governance Committee considers nominees for directors.

c.      Menaker also serves as the chairman of the American Kennel Club.

d.      Because of Menaker's position, he controlled and was involved with the intricacies and business of Reckson, its accounting transactions, finances, markets and present and future business prospects, had access to internal corporate documents, conversations and connections with other corporate officers and employees, attended management and Board meetings and committees thereof and had access to all reports and other information provided to him in connection therewith.   Menaker participated in the review and approval of the Strategic Plan.

25.      Defendant Peter Quick ("Quick") has served as a director of the Company since 2002.

a.      Quick is a member of Reckson's Compensation Committee and Nominating and Corporate Governance Committee.

b.      Quick has served as president of the American Stock Exchange and on its Board of Governors since July 2000.  From 1982 to 2000, Quick worked for Quick & Reilly, Inc. (now an affiliate of Fleet Boston Financial), a national discount brokerage firm, holding various positions, including president and chief executive officer thereof. Quick is a director of the Securities Industry Automation Corporation (SIAC) and The Depository Trust & Clearing Corporation.

c.      As reported in a June 11, 2000, *Newsday* article, titled "As an Investor, He's No Hillary/Lazio has Active, If Modest, Portfolio," discussing Hillary Clinton's and Rick Lazio's investment choices, "Lazio made investments in Quick & Reilly, that earned him between $11,000 and $32,5000 in the weeks and months before Fleet Financial Group announced that it was acquiring Quick & Reilly for $1.6 billion. During the period Lazio owned the stock, its value nearly doubled, and he also profited

11

from a "call option" that he purchased just 48 days before the merger was announced. Peter and Chris Quick, who were executives in the firm their father started, have been financial supporters of Lazio, but they said last week they were unaware he had invested in their firm.  'Our discussions always involve politics, never business,' said Chris Quick."  The article went on to state that, Lazio "began more actively trading stocks in 1996, several times in companies tied to his financial supporters," which included Lazio's purchase of stock in Tower Realty in July, 1998, "the day its takeover by Reckson was reported. Reckson's chief executive is Scott, another of Lazio's financial contributors."

       d.      In addition, Quick is an Annual Fund Donor to the Long Island Children's Museum ($10,000-$24,999), the community charity that Scott described as "the one [he is] most active in . . .  This past year we opened up a 40,000 square foot museum and raised more than $16 million" in a NARIET Real Estate Portfolio Article, November/December 2002 Issue, titled "Scott Rechler Family Matters."

       e.      Because of Quick's position, he controlled and was involved with the intricacies and business of Reckson, its accounting transactions, finances, markets and present and future business prospects, had access to internal corporate documents, conversations and connections with other corporate officers and employees, attended management and Board meetings and committees thereof and had access to all reports and other information provided to him in connection therewith.  Quick participated in the review and approval of the Strategic Plan.

26.    Defendant Herve A. Kevenides ("Kevenides") has served as a director of the Company since 1995.

a.      Since 1997, Kevenides has served as the managing director, Research Group for Landauer Associates, a real estate consulting and valuation firm.  Kevenides served from 1995 to 1996 as the director of the Real Estate Products Group for Ceres Financial Concepts, N.A.  Since 1988, Kevenides has been the president and director of research of Metropolitan Analysis & Forecasting Corporation, an international real estate economics and market research firm.

b.      Kevenides is a member of Reckson's Audit Committee, Executive Committee and Nominating and Corporate Governance Committee.

c.      Because of Kevenides' position, he controlled and was involved with the intricacies and business of Reckson, its accounting transactions, finances, markets and present and future business prospects, had access to internal corporate documents, conversations and connections with other corporate officers and employees, attended management and Board meetings and committees thereof and had access to all reports and other information provided to him in connection therewith.  Kevenides participated in the review and approval of the Strategic Plan.

27.     Defendant John V. N. Klein ("Klein") has served as a director of the Company since 1995.

a.      Klein is a member of Reckson's Executive Committee and Nominating and Corporate Governance Committee.

b.      Klein was the managing attorney of the law firm of Meyer, Suozzi, English & Klein, P.C. between 1984 and 1997 and currently serves as chairman of the firm. Klein served as a director of Fleet Bank from 1980 to 1994 and has served in

various government positions on Long Island, including County Executive of Suffolk County, New York from 1972 to 1979.

c. In the 1960s, the late William Rechler ("William") and defendant Walter Gross ("Gross") purchased 400 acres in Hauppauge, Suffolk County that was put up for sale by International Telephone & Telegraph. When William and Gross decided it was time to build on the 400 acres, they contacted Klein, who had become the Smithtown Supervisor in 1964. A February 21, 2003 article in the *Long Island Business News*, titled "Hauppauge Industrial Park Marks 50th Anniversary", notes the following:

> "[I]f they were crazy enough to commit that kind of investment I was crazy enough to make it happen," Klein says of what is now known as the John V.N. Klein Hauppauge Industrial Park. "It was really a pioneering effort – industrial parks of any kind were unknown, and one of that magnitude was almost unthinkable. I cut red tape wherever I could and got answers when they needed it," adds Klein, who later served as Suffolk County Executive and now practices law with Meyer, Suozzi, English and Klein.

d. From at least 1988, defendant Klein acted as counsel to the Association for a Better Long Island, the same organization founded by Donald and for which he was a former President and Chairman. An October 12, 1994 *Newsday* article titled "For ABLI, the Status Quo is Easier to Bulldoze", notes that:

> The ABLI (a.k.a. the Association to Bulldoze Long Island) has only 25 members and should get no more attention than any other small self-interest group. But it does. That's because the members, including Wilbur Breslin, Donald Rehler and Roger Tilles, control $15 billion in real estate, contribute copiously to political candidates and have tried to steamroll (as it were) every planning commission, zoning board and town counsel . . . But especially with the help of its counsel, former Suffolk County Executive John V.N. Klein, the group has the wherewithal to cause a lot of mischief.

e. Because of Klein's position, he controlled and was involved with the intricacies and business of Reckson, its accounting transactions, finances, markets and present and future business prospects, had access to internal corporate documents,

14

conversations and connections with other corporate officers and employees, attended management and Board meetings and committees thereof and had access to all reports and other information provided to him in connection therewith. Klein participated in the review and approval of the Strategic Plan.

28.    Defendant Conrad D. Stephenson ("Stephenson") has served as a director of the Company since 1995.

      a.    Stephenson is a member of Reckson's Audit Committee, Executive Committee and Nominating and Corporate Governance Committee.

      b.    Stephenson served as the chief executive officer of Pan Am Equities Inc., a property ownership and management company, from 1993 to 1997, and currently serves as a consultant thereto.

      c.    Because of Stephenson's position, he controlled and was involved with the intricacies and business of Reckson, its accounting transactions, finances, markets and present and future business prospects, had access to internal corporate documents, conversations and connections with other corporate officers and employees, attended management and Board meetings and committees thereof and had access to all reports and other information provided to him in connection therewith. Stephenson participated in the review and approval of the Strategic Plan.

29.    Defendant Lewis S. Ranieri ("Ranieri") has served as a director of the Company since 1997.

      a.    Ranieri is chairman of Reckson's Compensation Committee and a member of Reckson's Nominating and Corporate Governance Committee.

        b.      Ranieri is the chairman and chief executive officer of Ranieri & Co., Inc., positions he has held since founding the Company in 1988. Ranieri is the founder of Hyperion Partners L.P. and Hyperion Partners II L.P., private investment limited partnerships ("Hyperion"), the chairman of Hyperion Capital Management, Inc., a registered investment adviser., and the chairman of the following registered investment funds: Hyperion 2005 Investment Grade Opportunity Trust, Inc.; The Hyperion Total Return Fund, Inc.; and The Strategic Mortgage Income Fund, Inc.  Ranieri is a director of Delphi Financial Group, Inc. and Computer Associates International, Inc.  Since 2002, Ranieri has also served as the chairman of the Board of Trustees of American Financial Realty Trust, a REIT focused on acquiring and operating properties leased to regulated financial institutions.

        c.      Reckson is the landlord for Ranieri's Mitchell Field-based company.

        d.      Ranieri served as finance chairman and chief fund-raiser for Rick Lazio's unsuccessful United States Senate campaign.

        e.      In addition, Ranieri is a Capital Campaign Donor to the Long Island Children's Musuem, Leaders Circle Donor ($500,000-$999,999), the community charity that Scott described as "the one [he is] most active in.  This past year we opened up a 40,000 square foot museum and raised more than $16 million" in a NARIET Real Estate Portfolio Article, November/December 2002 Issue, titled "Scott Family Matters."

        f.      Also, along with defendants Donald and Scott, and OP, Ranieri is a large contributor to the North Shore Long Island Jewish Health System ("LIJ").  The

Rechler family's lifetime giving is in the range of $100,000-$499,999 and Ranieri's lifetime giving is in the range of $1,000,000-$4,999,999 to LIJ.

        g.     Ranieri was also a former vice president of Salomon Brothers, Inc., ("Salomon Brothers") and, as noted in a January 17, 2003, *Wall Street Journal Online Article*, "Financial Legend Bets on Bank-Branch REIT, he transformed "Salomon Brothers' sleepy mortgage-trading division into one of the securities firm's biggest profit centers in the 1980s and [ ] is credited with helping develop the huge market for mortgage-backed securities."  Salomon Brothers was one of the underwriters for the Reckson April 2, 1996 Prospectus and Salomon Smith Barney was noted by Quick in the September 11, 2003 Reckson Investor Conference Call, as involved in a supposed independent review of the industrial portfolio.

        h.     Because of Ranieri's position, he controlled and was involved with the intricacies and business of Reckson, its accounting transactions, finances, markets and present and future business prospects, had access to internal corporate documents, conversations and connections with other corporate officers and employees, attended management and Board meetings and committees thereof and had access to all reports and other information provided to him in connection therewith.  Ranieri participated in the review and approval of the Strategic Plan.

30.    Defendant Gross has served as Chairman of the Board Emeritus of the Company since its formation.

        a.     In 1961, together with the late William, Gross conceived of and developed Vanderbilt Industrial Park, the first planned industrial park built on Long

Island.  He also owned and operated Walter J. Gross Construction Corp., a general contracting firm.

        b.     Because of Gross' position, he controlled and was involved with the intricacies and business of Reckson, its accounting transactions, finances, markets and present and future business prospects, had access to internal corporate documents, conversations and connections with other corporate officers and employees, attended management and Board meetings and committees thereof and had access to all reports and other information provided to him in connection therewith.  Gross participated in the review and approval of the Strategic Plan.

31.     Defendant OP is a limited partnership organized and existing under the laws of the State of Delaware with its principal offices located at 225 Broadhollow Road, Melville, New York 11747.

32.     Nominal Defendant Reckson is a corporation organized and existing under the laws of the State of Maryland with its headquarters located at 225 Broadhollow Road, Melville, New York 11747.

33.     Defendants identified in ¶¶ 19 through 23 are referred to herein as the "Rechler Defendants." Defendants identified in ¶¶ 24 through 30 are referred to herein as the "Individual Defendants." Collectively, the Rechler Defendants, the Individual Defendants and defendant OP are referred to herein as the "Defendants."

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

34.     In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the

wrongful conduct herein alleged as giving rise to primary liability, the Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

35.    During all times relevant hereto, the Defendants collectively and individually initiated a course of conduct which was designed to cause the Company to: (a) enter into a Strategic Plan that will result in the Company forfeiting for less than fair value the Industrial Properties to the Rechler family some of whom are also members of the Board and Executive Officers of the Company; (b) pay over $10 million to the Rechler family to settle the Family Employment Contracts; (c) perpetuate the Company's misguided business plan which include the formation of companies to further funnel compensation to the Rechler family, which have now gone bankrupt; (d) maintain Scott's executive position at Reckson and the profits, power, and prestige which he will enjoy as a result of this position; (e) give, to the detriment of the Company, the Rechler family an inequitable exit-strategy from Reckson to relieve them of substantial tax liabilities; (f) deceive the investing public, including shareholders of Reckson, regarding Reckson's operations, pre- and post-implementation of the Strategic Plan; and (vii) deceive the Reckson shareholders about the Company's financial health and stability, and Reckson's future business prospects.

36.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

37.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Defendants' violations of law, including its breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment and to conceal information

about the Strategic Plan that was adverse to the Company's operations, financial condition, and future business prospects.

38.     Because the actions described herein occurred under the authority of the Board, each of the Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

39.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Rechler and Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing and was aware of his overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

### Background of Reckson's Business

40.     The Reckson Group was the predecessor to Reckson founded in 1957 by the late William.  The Reckson Group was engaged in the ownership, management, operation, leasing and development of commercial real estate properties, principally office and industrial buildings, and also owned certain undeveloped land located primarily on Long Island, New York.

41.     RA was organized as a general partnership in 1967 by Donald and Roger. Reckson was organized as a Maryland corporation and OP was formed as a Delaware limited partnership in September 1994 and commenced operations effective with the completion of the IPO on June 2, 1995.

42.     The Company became the sole general partner of OP by contributing substantially all of the net proceeds of the IPO in exchange for an approximate 73% interest in OP.

43.     All properties acquired by the Company are held by or through the OP.
Specifically, in conjunction with the IPO, OP executed various option and purchase agreements
whereby it issued an aggregate of 2,758,960 common units of limited partnership interest in OP
("OP Units") to the Rechler family, including the Rechler Defendants, and Reckson entities in
exchange for:  (a) interests in certain property partnerships; (b) fee simple and leasehold interests
in properties and development land; (c) certain other business assets; and (d) 100% of the non-
voting preferred stock of the RMG and RCG.

44.     At June 30, 2003, the Company's ownership percentage in the OP was
approximately 89.5%.

45.     Reckson and OP were formed for the purpose of continuing the commercial real
estate business of Reckson Group and RA, and their affiliated partnerships and other entities.
Reckson owns all of its real properties, directly or indirectly, through OP.

46.     For more than 40 years, Reckson (or its predecessors) has been engaged in the
business of owning, developing, acquiring, constructing, managing and leasing office and
industrial properties in the New York Tri-state area (the "Tri-State Area").

47.     Reckson bills itself as one of the largest owners and operators of Class A
suburban and central business district ("CBD") office properties and industrial properties in the
Tri-State Area.

48.     Reckson operates as a fully integrated, self-administered and self-managed real
estate investment trust ("REIT").

49.     Reckson conducts its management, leasing and construction related services
through taxable REIT subsidiaries as defined by the Internal Revenue Code of 1986.  These
services are currently provided by RMG, RANY Management Group, Inc., Reckson

21

Construction Group New York, Inc. and RCG in which, as of September 30, 2002, OP owned a 97% non-controlling interest.

50.    As of December 31, 2002, the Company owned 178 properties (inclusive of 11 joint venture properties) in the Tri-State Area suburban and CBD markets, encompassing approximately 20.3 million rentable square feet, all of which are managed by the Company.

a.    These properties include 60 Class A suburban office properties encompassing approximately 8.5 million rentable square feet, of which 42 of these properties, or 74% as measured by square footage, are located within the Company's ten office parks.  Reckson has historically emphasized the development and acquisition of properties that are part of large-scale suburban office parks.  The Company believes that owning properties in planned office and industrial parks provides certain strategic advantages.

b.    The properties also include 15 Class A CBD office properties encompassing approximately 5.1 million rentable square feet.  The CBD office properties consist of five properties located in New York City, eight properties located in Stamford, Connecticut, and two properties located in White Plains, New York.

c.    Additionally, the properties include 101 industrial/R&D properties encompassing approximately 6.7 million rentable square feet, of which 71 of these properties, or 58% as measured by square footage, are located within the Company's three industrial parks.

(i)    As of December 31, 2002, the industrial/R&D properties were approximately 94.7% leased (percentage leased excludes properties under development) to approximately 239 tenants.  Many of these properties have been

constructed with high ceiling heights (i.e., above 18 feet), upscale office building facades, parking in excess of zoning requirements, drive-in and/or loading dock facilities and other features which permit them to be leased for industrial and/or office purposes.

(ii) The industrial/R&D properties are leased to both national and local tenants.

(iii) Approximately 86%, as measured by square footage, of the industrial/R&D properties, are located on Long Island. Fifty-eight percent of these properties, as measured by square footage, are located in the following three industrial parks developed by RA, the predecessor to the Company: (i) Vanderbilt Industrial Park; (ii) Airport International Plaza; and (iii) County Line Industrial Center.

(iv) In addition to the industrial / R&D properties on Long Island, the Company owns eight industrial properties encompassing approximately 912,000 square feet in the other suburban markets.

d.   The properties also include two retail properties comprising approximately 20,000 rentable square feet.

e.   The Company also owns a 355,000 square foot office property located in Orlando, Florida.

f.   The Company also owns approximately 338 acres of land in 14 separate parcels on which the Company can develop approximately 3.2 million square feet of office space and approximately 470,000 square feet of industrial space. The Company is currently evaluating alternative land uses for certain of the land holdings to

realize the highest economic value. These alternatives may include rezoning certain land parcels from commercial to residential for potential disposition. As of December 31, 2002, the Company had invested approximately $121.2 million in these development projects. Reckson's management has made subjective assessments as to the value and recoverability of these investments based on current and proposed development plans, market comparable land values and alternative use values. The Company has capitalized approximately $10.5 million for the year ended December 31, 2002, related to real estate taxes, interest and other carrying costs related to these development projects. Since the IPO, the Company has developed, redeveloped, renovated or repositioned 27 properties encompassing approximately 5.3 million square feet of office and industrial / R&D space.

51.     In its Form 10-K for the period ended December 31, 2002, and filed on March 24, 2003 (the "2002 10-K"), Reckson disclosed that its "external growth" plan would consist of the following:

> The Company seeks to acquire multi-tenant Class A office buildings in New York City and the surrounding Tri-State Area core suburban and CBD markets as well as industrial properties located in the Tri-State Area. Management believes that the Tri-State Area presents future opportunities to acquire or invest in properties at attractive yields.

> * * *

> The Company also intends to selectively develop new Class A suburban and CBD office and industrial properties and to continue to redevelop existing properties as these opportunities arise. The Company will concentrate its development activities on industrial and Class A suburban and CBD office properties within the Tri-State Area. The Company's expansion into the New York City office market has provided it with future opportunities to acquire interests in properties at attractive yields.

> * * *

> In addition, when valuations for commercial real estate properties are high, the Company will seek to sell certain properties or interests therein

24

to realize value and profit created. The Company will then seek opportunities to reinvest the capital realized from these dispositions back into value-added assets in the Company's core Tri-State Area markets, as well as pursue its stock repurchase program.

## FrontLine

52.    During 1997, the Company formed FrontLine and Reckson Strategic Venture Partners LLC ("RSVP"). RSVP is a real estate venture capital fund which invests primarily in real estate and real estate operating companies outside the Company's core office and industrial focus and whose common equity is held indirectly by FrontLine.

53.    In connection with the formation and spin-off of FrontLine, OP established an unsecured credit facility with FrontLine (the "FrontLine Facility") in the amount of $100 million for FrontLine to use in its investment activities, operations and other general corporate purposes. The Company advanced approximately $93.4 million under the FrontLine Facility. OP also approved the funding of investments of up to $100 million relating to RSVP (the "RSVP Commitment"), through RSVP-controlled joint ventures (for REIT-qualified investments) or advances made to FrontLine under an unsecured loan facility (the "RSVP Facility") having terms similar to the FrontLine Facility (advances made under the RSVP Facility and the FrontLine Facility hereafter, the "FrontLine Loans").

54.    During March 2001, the Company increased the RSVP Commitment to $110 million and as of December 31, 2002, approximately $109.1 million had been funded through the RSVP Commitment, of which $59.8 million represents investments by the Company in RSVP-controlled (REIT-qualified) joint ventures and $49.3 million represents loans made to FrontLine under the RSVP Facility. As of December 31, 2002, interest accrued (net of reserves) under the FrontLine Facility and the RSVP Facility was approximately $19.6 million. RSVP retained the services of two managing directors to manage RSVP's day to day operations. Prior

to the spin off of FrontLine, the Company guaranteed certain salary provisions of their employment agreements with RSVP Holdings, LLC, RSVP's common member.  The term of these employment agreements is seven years commencing March 5, 1998, provided, however, that the term may be earlier terminated after five years upon certain circumstances.  The salary for each managing director is $1 million in the first five years and $1.6 million in years six and seven.

55.     At June 30, 2001, the Company assessed the recoverability of the FrontLine Loans and reserved approximately $3.5 million of the interest accrued during the three-month period then ended.  In addition, the Company formed a committee of its Board, comprised solely of so-called independent directors, to consider any actions to be taken by the Company in connection with the FrontLine Loans and its investments in joint ventures with RSVP.

56.     During the third quarter of 2001, the Company noted a significant deterioration in FrontLine's operations and financial condition and, based on its assessment of value and recoverability and considering the findings and recommendations of the committee and its financial advisor, the Company recorded a $163 million valuation reserve charge, inclusive of anticipated costs, in its consolidated statements of operations relating to its investments in the FrontLine Loans and joint ventures with RSVP.

57.     The Company has discontinued the accrual of interest income with respect to the FrontLine Loans.  The Company has also reserved against its share of Generally Accepted Accounting Principles ("GAAP") equity in earnings from the RSVP-controlled joint ventures funded through the RSVP Commitment until such income is realized through cash distributions.  If the RSVP-controlled joint ventures reported losses, the Company would record its proportionate share of such losses.

58.    FrontLine is in default under the FrontLine Loans from the OP and on June 12, 2002, filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code.  As a result of the foregoing, the net carrying value of the Company's investments in the FrontLine Loans and joint venture investments with RSVP, inclusive of the Company's share of previously accrued GAAP equity in earnings on those investments, is approximately $65 million.

59.    Scott, who serves as Co-Chief Executive Officer and a director of the Company, serves as CEO and chairman of the board of FrontLine.  Other Reckson executives also served as officers of FrontLine: From 1998 to 2001, Michael Maturo served as an executive officer and director FrontLine, and is currently the Chief Financial Officer and Treasurer of Reckson; and, From 1998 to 2000, Jason M. Barnett served as an officer of FrontLine, and is currently Executive Vice President, General Counsel, and Assistant Secretary of Reckson.

60.    According to a *Newsday* Article, "FrontLine Seeks Filing Extension," on September 11, 2003, FrontLine asked U.S. Bankruptcy Judge Robert Drain in Manhattan to give it until November 28th, to file a plan and until January 30, 2004 to seek creditors' support for the reorganization strategy.

61.    Conveniently, Defendants have developed and intend to implement a Strategic Plan that allows for the Rechler family to, among other things, acquire the Industrial Properties, receive beneficial tax treatment and receive $10 million in severance pay, all before the full impact of the FrontLine bankruptcy on Reckson will publicly disclosed.

62.    As presently scheduled, the closing on the Strategic Plan and the divestiture of the Industrial Properties will coincide with the earliest conclusion of FrontLine's bankruptcy.

63.    It is not coincidental that the Rechler family, which is effectively in control of both the FrontLine bankruptcy schedule and the Strategic Plan, would want to avoid having the

full FrontLine debacle (which occurred under its tutelage and on its watch) disclosed before the Strategic Plan was implemented.

**The Strategic Plan**

64.     On the night of Wednesday, September 10, 2003, Reckson and its executives announced a deal that would rank as the largest-ever real estate transaction involving the Long Island Industrial Portfolio.

65.     Defendants are implementing what is a very obvious self-dealing transaction under a shroud of secrecy, vagueness and imprecision.

66.     Even the Company's Form 8-K, filed with the SEC on September 18, 2003 ("9/18/03 8-K"), as discussed below, wholly fails to disclose material facts about the transaction.

67.     Defendants have made no effort to persuade the investment community that Reckson is receiving fair market value for the divestiture of its Industrial Properties or the relinquishment of certain other rights as contemplated by the transaction.

68.     There were no appraisals done of the Industrial Properties comprising the Long Island Industrial Portfolio and there was no effort to market the Long Island Industrial Portfolio (or the Industrial Properties individually) to third parties.

69.     According to Reckson's news release, a September 11, 2003 investor conference call ("9/11/03 Call"), Reckson's "Announcement of Strategic Plan slide show dated September 10, 2003 ("Slide Show"), and the 9/18/03 8-K, the self-styled Strategic Plan primarily involves the divestiture of Reckson's Long Island Industrial Portfolio.

70.     The target date for the completion of the Strategic Plan is January 1, 2004.  And, as Quick, the lead of the purported "independent directors," clearly relayed on the 9/11/03 Call: "This is done" and nothing else is being contemplated.

**Divestiture of Long Island Industrial Portfolio**

71.     The Strategic Plan is tainted by the fact that its principal objective is minimizing and deferring tax obligations of the Rechler family, and to do so to the detriment of Reckson and its public shareholders.

72.     From the outset of the development of the Strategic Plan, the Defendants could never fulfill their fiduciary obligations owed to the Company or its public stockholders, because they made no effort to seek outside bidders, appraise the Industrial Properties, inform themselves of the fair market value of the Long Island Industrial Portfolio, or seriously consider any alternatives that would involve a transaction with third parties.

73.     The sale of the Long Island Industrial Portfolio in this manner amounts to no more than a grossly self-interested exit strategy for the Rechler family to avoid, and at the least defer, substantial taxable events, to the detriment of the plaintiff and Reckson.

74.     Having obtained OP Units (discussed above at ¶ 43) in exchange for their asset contributions to OP back in 1995, any subsequent sale to a third party of those properties would have resulted in substantial taxable gain to the Rechler Defendants.

75.     Scott indicated that this was a driving force behind the Strategic Plan, by noting during the 9/11/03 Call that it was "unrealistic" to think this portfolio could be put out for bid because of the tax implications to his family.  Even if the tax implications to the Rechler family were a pertinent consideration (which, of course, it is not, if such consideration is contrary to the interest of the Company), contrary to Scott's asserted belief, a sale to an independent, disinterested third-party entity, in a deal that included the exchange of OP Units, would have tax implications comparable to the self-interested transaction now proposed.

76.     The overarching objective of insulating and delaying the tax impact on the Rechler family, dominated and controlled the "negotiation" of the disposition of the Industrial Properties, prevented any meaningful independent assurances as to the value to be received by Reckson for the Long Island Industrial Portfolio and was in complete contravention of the fiduciary duties owed to Reckson.

77.     Defendants' statements concerning the valuation of the Long Island Industrial Portfolio are internally inconsistent and indicate that as much as $100 million of value has been unaccounted for by Defendants.

78.     The Slide Show indicates that the Annualized Net Operating Income ("NOI") figures of $32.5 million and $33.3 million are representative of the NOI derived from the Long Island Industrial Portfolio. However, further on in the Slide Show, a pie chart indicates that the Industrial Portfolio represents 16% of Reckson's NOI, and post-implementation of the Strategic Plan, the Long Island Industrial Portfolio would represent 3% of Reckson's NOI.

79.     Reckson's 2002 10-K, at footnote 11, indicates that the Core Portfolio's NOI was $318 million (2002 Core Portfolio Revenues of $489 million less $171 million in Industrial Properties expenses). Therefore, 2002 10-K indicates that the NOI of the Long Island Industrial Portfolio, pre-implementation of the Strategic Plan, is almost $51 million ($318 million NOI times 16%). Post-implementation of the Strategic Plan, and accounting for the loss of Industrial Properties from the Core portfolio, the Long Island Industrial Portfolio NOI would be almost $8 million. This $43 million NOI for the divested Long Island Industrial Portfolio ($51 million less $8 million) is at least $10 million higher than the $32.5 to $33.3 million indicated in the Slide Show. Using the capitalization rate indicated by Defendants, this amounts to over $100 million in value left unaccounted for by Defendants.

80.     In addition, loss of these assets will, in addition to other negative impacts, cause Reckson to:

a.      take at least the following 2003 fourth quarter estimated restructuring charges totaling $11,000,000:  (a) settlement of the Family Employment Contracts in the amount of $10.3; and (b) other restructure costs of $700,000; and

b.      subsidize through the sale of other of Reckson's assets an expected $20-25 million shortfall in 2004 so as to keep the Reckson dividend policy unchanged as a result of the transaction.

**Corporate Governance Restructuring**

81.     Further demonstrating their complete failure to act in accordance with their fiduciary obligations, Defendants did not first implement the corporate governance changes, and then have the reconstituted board formulate the terms of the Strategic Plan and, specifically, the terms of the Rechler family's purchase of the Long Island Industrial Portfolio.  Rather, the conflicted Board determined the terms of the Strategic Plan.

82.     Supposed pressure by the investment community gave Defendants a "justification" for causing Reckson to implement the Strategic Plan:  the purported restructuring of Reckson's "corporate governance to be an industry leader."

83.     Reckson noted during the 9/11/03 Call and in the text of the Slide Show that the "Company has faced market perception issues related to family concentration and corporate governance issues."  Thus, it was with that backdrop, Scott noted, that they decided that Reckson was to "take the next step in its evolution."

84.     Implementation of the Strategic Plan will not eliminate any conflicts of interest and not alleviate the control and influence the Rechler family has over Reckson and the Board members and its Executive Officers.

85.     The so-called independent directors have long-standing, inter-related and entangling business, personal and professional relationship with the Rechler family, as detailed in ¶¶ 19 through 30 above.

86.     After the implementation of the Strategic Plan, the Board will consist of Donald, who will become non-executive Chairman; Scott, who will serve as Chief Executive Officer and President; and six directors — defendants Kevenides, Klein, Menaker, Ranieri, Stephenson and Quick — who are assertedly independent, but in reality at least a majority of whom are puppets of the Rechler family.

**Executive Contracts**

87.     As of January 1, 2004, there will be 20 months remaining on the Family Employment Contracts.

88.     As part of the Strategic Plan, Defendants will cause Reckson to pay members of the Rechler family $10.3 million as a settlement of the Family Employment Contracts.

89.     Since the IPO, Defendants have caused Reckson to pay members of the Rechler family excessive compensation for their roles as executives of Reckson.

90.     Donald and Scott have been "**Co**- Chief Executive Officers" and for serving in this executive position, each received in the aggregate for the last three years of employment at Reckson (2000, 2001 and 2002), over $4.5 million and $3.3 million, respectively, for over $7.8 million in total compensation.

91.     Mitchell and Gregg have been "**Co**- Presidents" and for serving in this executive position, underlined each received $3.3 million, for over $6.6 million in total compensation.

92.     This unabashed double-dipping has gone not only unchecked, but authorized by Defendants and Reckson's supposed "independent" directors serving on the Compensation Committee.     And now, the Rechler family will receive an additional $10 million in compensation, while being relieved of their duties to Reckson, and being left free to profit from the operations of the Long Island Industrial Portfolio as part of REP.

93.     Scott will remain as an executive officer of Reckson and continue to collect excessive compensation and hold an interest in REP.

**Option Properties**

94.     In connection with the IPO, Reckson was granted ten-year options to acquire ten properties (the "Option Properties"), which are either owned by certain Rechler family members who are also executive officers of the Company or in which the Rechler family members own a non-controlling minority interest, at a price based upon an agreed upon formula.

95.     According to Reckson's April 2, 1996 Prospectus, OP was granted options to acquire each of the Option Properties at a purchase price equal to the lesser of: (i) a fixed price; and (ii) the Net Operating Income attributable to such Option Property during the twelve-month period preceding exercise of the option by Reckson OP divided by a capitalization rate of 11.5%; provided that, in no event shall the purchase price be less than the outstanding balance of the mortgage debt encumbering the Option Property on the acquisition date.

96.     In years prior to 2001, one of these properties was sold by the Rechler family members to a third party and four of these properties were acquired by the Company for an

aggregate purchase price of approximately $35 million, which included the issuance of approximately 475,000 OP Units valued at approximately $8.8 million.

97.     Certain Rechler family members retain their equity interests in the five remaining Option Properties (the "Remaining Option Properties"), which were not contributed to the Company as part of the IPO.  Such options provide the Company the right to acquire fee interest in two of the Remaining Option Properties and the Rechler family's minority interests in three Remaining Option Properties.

98.     In the 9/18/03 8-K, Reckson announced that as part of the Strategic Plan four out of five of Reckson's options in the five Remaining Option Properties would be <u>terminated</u> in connection with the transaction in exchange for an aggregate payment by Rechler family members to Reckson of $972,000.  The termination of Reckson's interests in these four Remaining Option Properties consists of the following:

a.     The termination of Reckson's option to acquire 593 Acorn Street, an Industrial Property located in Babylon, New York, in exchange for a payment to Reckson in the amount of $872,000; and

b.     The termination of Reckson's option to acquire Gateway, Huntington and Willets properties, in exchange for a payment to Reckson in the total amount of $100,000.

99.     Through the termination of Reckson's options on these four Remaining Option Properties, Defendants have caused Reckson to relinquish four valuable assets <u>without</u>: (a) any justification as to why the relinquishment of these assets is part of the Strategic Plan; (b) disclosing whether Reckson is getting fair value for such relinquishment; (c) obtaining appraisals of all of the four Remaining Option Properties; (d) disclosing, or obtaining, a valuation of

Reckson's options on these four Remaining Option Properties; (e) identifying the extent of the Rechler family's ownership, or the majority owner's identity; and (f) disclosing that Defendants are causing Reckson to give up a valuable corporate opportunity – the ability to acquire valuable assets on terms that are decidedly favorable to Reckson.

100.    The fifth Remaining Option Property is 225 Broadhollow Road, Melville, New York, Reckson's current headquarters. As part of the Strategic Plan, Defendants are causing Reckson to forego exercising its option to purchase 225 Broadhollow Road. Defendants are causing Reckson to enter into an agreement to extend the option term for five years and release Reckson from approximately 16,000 square feet under its lease at the 225 Broadhollow Road property.

101.    Instead of exercising Reckson's option on the 225 Broadhollow Road property, which would have constituted a growth opportunity for Reckson, Defendants are causing Reckson to extend its option so as to insulate the Rechler family from the tax consequences that would occur if Reckson were to exercise its option.

102.    Scott admitted as much during the 9/11/03 Call, when he indicated that this was all "structuring from a tax prospective [sic]." Defendants structured this aspect of the Strategic Plan so as to minimize and defer the tax obligations of the Rechler family, in blatant disregard and in contravention of fulfilling fiduciary obligations owed to the Company or its public stockholders.

103.    Defendants are causing Reckson to extend its option on the 225 Broadhollow Road property solely for the purpose of benefiting the Rechler family and placing the personal interests of the Rechler family before the best interests of Reckson and its shareholders.

104.    In addition, releasing Reckson of 16,000 square feet under its lease at the 225 Broadhollow Road property does not benefit Reckson, in that, as every aspect of this Strategic Plan is, it is a ruse for the Rechler family to occupy those 16,000 square feet, which will conveniently house REP and its new employees, some of who will be former Reckson employees hired away from Reckson.

105.    Without any justification as to why this is part of the Strategic Plan and without obtaining an appraisal of the 225 Broadhollow Road property, Defendants have caused Reckson to relinquish through the extension of Reckson's option on this property, a valuable corporate opportunity–the ability to acquire the 225 Broadhollow Road property on terms that are decidedly favorable to Reckson.

**9/18/03 8-K**

106.    Individual Defendants caused Reckson to file the 9/18/03 8-K to purportedly furnish to its shareholders and the investment community information about the Strategic Plan that it deemed important.

107.    The Rechler Defendants control Reckson's Disclosure Committee, which is responsible for the development and assessment of the financial and non-financial information to be included in the reports filed by Reckson with the SEC.

108.    Individual Defendants have caused Reckson to file a report with the SEC that may cause Reckson to be held liable for violations of the Securities Exchange Act of 1934, in that the 9/18/03 8-K, *inter alia*, contain false and misleading statements about the Strategic Plan, omits additional information as would have made the filing not misleading under the surrounding circumstances, omits information about the relationships among the members of the Board, omits information about the base on which the Strategic Plan was evaluated, and omits *pro forma*

financial information about the Long Island Industrial Portfolio being divested to the Rechler family.

**Review of Strategic Plan by Six Board Members Not Part of the Rechler Family.**

109.   During the 9/11/03 Call, Quick stated that the supposed independent directors conducted a review of the Strategic Plan.  According to Quick, he led the process, with the assistance of Ranieri, and four other independent directors.

110.   According to statements made during the 9/11/03 Call, Reckson's directors were advised on the transaction by Citigroup and Wachtell, Lipton, Rosen & Katz, LLP.

111.   According to Quick, after a series of meetings, the independent directors unanimously approved "some" of the transactions.  There was no further description of the aspects of this transaction that were approved or not approved, whether unanimously or otherwise.

112.   Based on at least the facts alleged herein, a majority (if not all) of these so-called "independent" directors are interested and not independent and cannot in good faith exercise independent or disinterested business judgment in determining whether this interested transaction is fair to Reckson or its shareholders.

113.   Because of their long-standing, inter-related and entangling business, personal and professional relationships, alleged herein, none of the Defendants will take action against or adverse to one another, they individually and collectively have developed debilitating conflicts of interest which prevent any Board members from taking any action that would constitute an independent review of the Strategic Plan, or would constitute the exercise of independent objective judgment in deciding whether to approve the Strategic Plan.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

114.    Plaintiff brings this action derivatively in the right of and for the benefit of Reckson to redress injuries suffered, and to be suffered, by Reckson resulting from breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the adding and abetting thereof, by Defendants.  Reckson is named as a nominal defendant solely in a derivative capacity.

115.    Plaintiff was a shareholder of the Company at the time of the wrongdoing complained of and continues to hold her shares.

116.    Plaintiff will fairly and adequately represent the interests of Reckson and its shareholders in enforcing and prosecuting Reckson's rights.

117.    The current Board of Reckson consists of the following individuals: defendants Donald, Roger, Scott, Mitchell, Gregg, Kevenides, Klein, Menaker, Ranieri, Stephenson and Quick.  In addition, Gross is Chairman of the Board Emeritus.

118.    As a result of the facts set forth herein, plaintiff has not made any demand on the Board to institute this action against the Defendants.

119.    Such demand would be a futile, wasteful and useless act.

120.    As detailed in ¶¶ 19 through 30 and 109 through 113, herein, a majority of Reckson's directors are interested or not independent directors because they have business, financial or familial relationships with each other, and specifically the Rechler family, which such relationships affect their judgment with respect to the Strategic Plan, and/or affect their conduct in a manner that is adverse to Reckson.

121. A majority of the Board are interested or not independent directors because they are subject to a controlling influence by other directors, specifically the Rechler family who have a material pecuniary interest in the Strategic Plan.

122. Thus, a majority of the Board is interested or not independent parties and cannot in good faith exercise independent or disinterested business judgment in determining whether to bring this action.

123. In order to bring this suit, a majority of the Board would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

124. Each member of the Board is alleged to have caused harm to Reckson and it would be futile for plaintiff to make demand upon these directors to cause Reckson to sue them to recover for their own wrongful injuries to Reckson.

125. The Defendants would not agree to permit Reckson to sue them, and even if they would so agree, because of their conflicted status, they should not be permitted to do so.

126. A demand, or any delay in awaiting a response to a demand, would cause irreparable harm to Reckson.

127. Just announced the evening of September 10, 2003, the Strategic Plan, in all its aspects, is currently underway and is slotted to be completed by January 4, 2004. Quick, the lead of the purported "independent directors," clearly relayed on the 9/11/03 Call that: "This is done" and nothing else is being contemplated.

128. The Defendants, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or

disguise those wrongs from Reckson's shareholders or recklessly and/or negligently disregarded the wrongs complained of herein, and therefore are not disinterested parties.

129.   The acts complained of constitute violations of the fiduciary duties owed by Reckson's officers and directors and these acts are incapable of ratification.

130.   Reckson has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct and damages Reckson suffered and will suffer thereby; it is a done deal according to the Board.

131.   Any suit by the Board to remedy these wrongs would likely expose the Individual Defendants and Reckson to violations of the securities laws which would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

132.   If Reckson's officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders of Reckson.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions which eliminates coverage for any action brought directly by Reckson against these Rechler and Individual Defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Reckson, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the

other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause Reckson to sue them, since they will face a large uninsured liability.

**COUNT I**
**(Against the Rechler and Individual Defendants for Breach of Fiduciary Duty)**

133.   Plaintiff incorporates by reference and realleges each and every allegation set forth in ¶¶ 1 through 132 above, as though fully set forth herein.

134.   The Rechler and Individual Defendants owed and owe Reckson fiduciary obligations.

135.   By reason of their fiduciary relationships, the Rechler and Individual Defendants owed and owe the Reckson the highest obligation of good faith, fair dealing, due care and loyalty.

136.   By reason of their positions as officers, directors, and/or fiduciaries, and because of their ability to control the business and corporate affairs of Reckson, the Rechler and Individual Defendants owe and owed Reckson fiduciary obligations of trust, loyalty, good faith, and due care and were and are required to use their utmost ability to control and manage Reckson in a fair, just, honest, and equitable manner.

137.   The Rechler and Individual Defendants were and are required to act in furtherance of the best interests of Reckson and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

138.   Each director and officer of the Company owes to Reckson and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

41

Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

139.    In addition, as officers and/or directors of a publicly held company, the Rechler and Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's transactions.

140.    Because of their advisory, executive, managerial, and directorial positions with Reckson, each of the Rechler and Individual Defendants had access to adverse non-public information about the financial condition, operations, and the Strategic Plan.

141.    At all times relevant hereto, each of the Rechler and Individual Defendants was the agent of each of the other Rechler and Individual Defendants and of Reckson and OP, and was at all times acting within the course and scope of such agency.

142.    The conduct of the Rechler and Individual Defendants complained of herein involves a knowing and culpable violation of the Rechler and Individual Defendants' obligations, the absence of good faith on their part, and a reckless disregard for their duties to Reckson.

143.    The Rechler and Individual Defendants, and each of them, violated and breached their fiduciary duties of care, reasonable inquiry, oversight, good faith, supervision and loyalty by, among other things:

        a.    Developing and proposing to implement a so-called Strategic Plan that is nothing more than a thinly veiled vehicle:

                (i)    to transfer assets of Reckson to members of the Rechler family without assuring that Reckson receives fair market value for those assets;

(ii) and a self-dealing transaction that was completely dictated by the Rechler and Individual Defendants' desire to enter into a tax-advantaged deal with the Rechler family. By pursuing the sale of Reckson's valuable assets in this manner, Rechler and Individual Defendants assured that they could not fulfill their fiduciary obligations to Reckson and its shareholders; and

(iii) to adopt corporate governance provisions for the Company that should be adopted without the necessity of the proposed giveaways to members of the Rechler family.

b.      to justify paying members of the Rechler family exorbitant (and unearned) amounts under the Family Employment Contracts;.

c.      perpetuating the Company's misguided business plan which include the formation of companies which have now gone bankrupt to further funnel compensation to the Rechler family;

d.      maintaining Scott's executive position at Reckson and the profits, power, and prestige which he will enjoy as a result of this position;

e.      giving the Rechler family an exit-strategy to relieve them of substantial tax liabilities had the Long Island Industrial Portfolio been sold to a third party;

f.      deceiving the investing public, including shareholders of Reckson, regarding Reckson's operations, pre- and post-implementation of the Strategic Plan;

g.      deceiving the shareholders about the Company's financial health and stability, and Reckson's future business prospects;

h.      deceiving the shareholders about the corporate governance structure of Reckson, pre- and post-implementation of the Strategic Plan, in that the Strategic Plan

43

was not approved by a disinterested majority of outside directors and Reckson will continue to be managed under the unchecked influence of the Rechler family; and

        i.      participating in, approving and/or permitting the wrongs alleged herein to have occurred and participating in efforts to conceal or disguise those wrongs from Reckson's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein.

144.    The acts complained of constitute violations of the fiduciary duties owed by Reckson's officers and directors and these acts are incapable of ratification.

145.    Since the Strategic Plan was not approved by an affirmative vote of a majority of disinterested directors, or the fact of the common interest among the Rechler and Individual Defendants was not disclosed or known to purport outside directors voting on the Strategic Plan, Rechler and Individual Defendants are required to prove the strategic plan is fair and reasonable to Reckson.

146.    As a direct and proximate result of the Rechler and Individual Defendants' failure to perform their fiduciary obligations, Reckson has suffered damages for which the Rechler and Individual Defendants are monetarily liable.

147.    As a result of the misconduct alleged herein, the Rechler and Individual Defendants are liable to the Company.

## COUNT II
## (Against Rechler Defendants for Unjust Enrichment)

148.    Plaintiff incorporates by reference and realleges each and every allegation set forth in ¶¶ 1 through 132 above, as though fully set forth herein.

149.    By their wrongful acts and omissions, the Rechler Defendants were unjustly enriched at the expense of and to the detriment of Reckson.

150.    Plaintiff seeks restitution from these Rechler Defendants, and each of them, on behalf of Reckson and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Rechler Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT III
### (Against All Defendants for Abuse of Control)

151.    Plaintiff incorporates by reference and realleges each and every allegation set forth in ¶¶ 1 through 132 above, as though fully set forth herein.

152.    The Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Reckson, for which they are legally responsible.

153.    As a direct and proximate result of the Defendants' abuse of control, Reckson has sustained significant damages.

154.    Reckson has suffered damages for which the Defendants are monetarily liable.

155.    As a result of the misconduct alleged herein, the Defendants are liable to the Company.

## COUNT IV
### (Against All Defendants for Gross Mismanagement)

156.    Plaintiff incorporates by reference and realleges each and every allegation set forth in ¶¶ 1 through 132 above, as though fully set forth herein.

157.    By their actions alleged herein, the Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Reckson in a manner consistent with the operations of a publicly held corporation.

158.    As a direct and proximate result of the Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, Reckson has sustained damages .

159.    Reckson has suffered significant damages for which the Defendants are monetarily liable.  As a result of the misconduct alleged herein, the Defendants are liable to the Company.

**COUNT V**
**(Against All Defendants for Waste of Corporate Assets)**

160.    Plaintiff incorporates by reference and realleges each and every allegation set forth in ¶¶ 1 through 132 above, as though fully set forth herein.

161.    As a result of the conduct alleged herein, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper inquiry, review and supervision, Defendants have caused Reckson to waste valuable corporate assets.

162.    As a result of the waste of corporate assets, Reckson has suffered damages for which the Defendants are monetarily liable to the Company.

**COUNT VI**
**(Against Rechler Defendants for Breach of Contract)**

163.    Plaintiff incorporates by reference and realleges each and every allegation set forth in ¶¶ 1 through 132 above, as though fully set forth herein.

164.    In consideration of the substantial compensation and professional enhancement and prestige, which each of the Rechler Defendants received as directors and officers of Reckson, each of the Rechler Defendants contracted with Reckson to act in the best interest of Reckson and to cause Reckson to operate lawfully and properly.

165.    By their actions and omissions set forth herein the Rechler Defendants breached their contractual obligations and commitments to Reckson by not acting in the best interests of Reckson.

166.    Reckson has been damaged by the Rechler Defendants' breaches of their contracts with Reckson.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests relief and judgment against Defendants as follows:

A.    For an Order determining that this suit is a proper derivative action and certifying plaintiff as appropriate representative of Reckson for said action;

B.    Declaring that the Defendants, and each of them, have been and/or have committed:   breaches of their respective fiduciary duties; abuses of control; gross mismanagement; waste of corporate assets; and/or unjustly enriched;

C.    For a grant of preliminary and permanent injunctive relief against the Defendants, their agents, servants, employees, and all other persons in active concert or privity or in participation with them, including, but not limited to:

    i.  enjoining them from implementing and effectuating the Strategic Plan as currently proposed, including, but not limited to, the sale of the Long Island Industrial Portfolio to the Rechler family ;

    ii.  requiring them to explore alternative options for the sale of the Long Island Industrial Portfolio, including but not limited to, shopping Reckson, or segments thereof, on the open market;

    iii.  requiring them to implement corporate governance protections, including the nomination and election by shareholders of outside

directors who are uninterested and unconnected with the Rechler family and current members of the Board;

iv. requiring the abrogation of executive employment and severance contracts;

v. requiring the newly elected independent members of the board to negotiate new executive employment and severance contracts, that would replace any existing executive employment and severance contracts;

vi. enjoining the termination and extension of the options on the five Remaining Option Properties; and

vii. enjoining the closing of any transaction until the full financial impact of the FrontLine bankruptcy on Reckson is publicly disclosed.

D. Against all Defendants, and each of them, and in favor of Reckson, for the amount of damages sustained by Reckson as a result of Defendants' breaches of fiduciary duties, abuses of control; gross mismanagement; waste of corporate assets; and/or unjust enrichment;

E. Awarding to Reckson restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, compensation, and other monies received by Defendants that are determined by this Court to be unlawfully obtained pursuant to the causes of action set forth herein;

F. Requiring Defendants to pay Reckson the amounts by which the Company has been damaged by reason of the conduct complained of herein and/or to the extent they have been unjustly enriched;

G.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure Reckson has an effective remedy;

H.    Awarding Reckson pre- and post-judgment interest on all claims herein;

I.    Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and costs, accountants' and experts' fees, costs, and expenses; and Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff, on behalf Reckson, demands a trial by jury on all issues so triable.

Dated: September 26 , 2003

**ZWERLING, SCHACHTER & ZWERLING, LLP**

By: _____
        Robert S. Schachter (RS 7243)
Shaye J. Fuchs (SF 9412)
New York Community Bank Building
615 Merrick Avenue
Westbury, NY 11590-6622
Telephone: (516) 832-9600
Facsimile:  (516) 832-9605

and

Anthony F. Prisco (AP 9633)
845 Third Avenue, Sixth Floor
New York, NY  10022
Telephone:  (212) 223-3900
Facsimile:  (212) 371-5969

**CHIMICLES & TIKELLIS LLP**
Nicholas E. Chimicles
Kimberly M. Donaldson
One Haverford Centre
361 West Lancaster Ave.
Haverford, PA 19041
Telephone:  (610) 642-8500
Facsimile:  (610) 649-3633

**Attorneys for Plaintiff**

\\Zszny01\Docs_NY\RECKSON ASSOCIATES\Tucker Complaint.doc

50

Judith A. Tucker, the plaintiff in the above-styled action declares:

I purchased shares of the convertible preferred Class A stock of Reckson Associates Realty Corp. prior to June 1, 2003 and continue to hold such shares. I reviewed the foregoing Complaint and authorized counsel to file the Complaint. This action is not collusive to confer jurisdiction on the United States, which it would not otherwise have.

I declare the above to be true under the penalty of perjury.


Dated:   9/25/03                                   _Judith A. Tucker_
                                                   Judith A. Tucker